B104 (FORM 104) (08/07)                                                                                         EDVA

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Bruce H. Matson, Chapter 11 Trustee | **DEFENDANTS**<br>Stephen A. Parson, Sr., et al. |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Christopher L. Perkins, LeClairRyan, A Professional<br>Corporation, Riverfront Plaza, East Tower, 951 East Byrd<br>Street, Richmond, VA 23219 (804) 783-7550 | **ATTORNEYS** (If Known) |
|---|---|

| **PARTY** (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☑ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☑ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Avoid and recover transfers, to compel turnover of property of the Estate, and for breach of contract

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
        actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
        (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court
        if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 3,000,000.00 |

Other Relief Sought

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Richmond Christian Center | BANKRUPTCY CASE NO.<br>13-36312 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Eastern | DIVISION OFFICE<br>Richmond | NAME OF JUDGE<br>Phillips |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br> /s/ Christopher L. Perkins | | |
| DATE<br><br>March 31, 2015 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Christopher L. Perkins | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, *unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

*Per LBR 7003-1, in the EDVA, a properly completed Adversary Proceeding Cover Sheet is required.

Christopher L. Perkins (VA Bar No. 41783)
Christian K. Vogel (VA Bar No. 75537)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 783-7550

*Counsel to Bruce H. Matson, Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RICHMOND CHRISTIAN CENTER, | ) | Case No. **13-36312** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| BRUCE H. MATSON, CHAPTER 11 TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding Case No. _____ |
| | ) | |
| STEPHEN A. PARSON, SR., STEPHEN A. PARSON, JR., SP-RCC PROPERTIES, LLC, YES BEHAVIORAL HEALTH, INC., LIFE CHANGERS MENTAL HEALTH AND SUPPORTIVE SERVICES OF VIRGINIA, INC., MARK PARSON, ANTHONY P. FISHER, PAMELA ANN FISHER, COMMERCIAL MORTGAGE CITY CORPORATION, JEFFREY LUSTBADER, KSUS GROUP GP, and KEN STEVENSON, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT TO AVOID AND RECOVER TRANSFERS, TO COMPEL TURNOVER OF PROPERTY OF THE ESTATE, AND FOR BREACH OF CONTRACT

Bruce H. Matson, Chapter 11 Trustee for Richmond Christian Center (the "**Trustee**"), by counsel, pursuant to 11 U.S.C. §§ 541, 542, 549, and 550 and Bankruptcy Rule 7001 of the Rules of Bankruptcy Procedure, and for his Complaint To Avoid and Recover Transfers, To Compel Turnover of Property of the Estate, and For Breach of Contract, respectfully states as follows:

### PARTIES

1.      Richmond Christian Center (the "**Debtor**") filed a voluntary petition under Chapter 11 of Title 11, United States Code, in the United States Bankruptcy Court for the Eastern District of Virginia on November 22, 2013, commencing the captioned case.

2.      The Trustee was appointed by Order dated January 6, 2015, and continues to serve in that capacity.

3. Steven A. Parson, Sr. ("**Pastor Parson**") is the pastor of the Debtor and, until recently, was a member of the Debtor's Board of Trustees.  Pastor Parson made numerous unauthorized transfers of property of the estate after the commencement of the case as more particularly described below.

4.      Steven A. Parson, Jr. ("**Parson, Jr**.") is Pastor Parson's son, and was at one time a member of the Debtor's Board of Trustees.

5.      SP-RCC Properties, LLC ("**SP-RCC**") is a Virginia limited liability company (not in good standing with the Virginia SCC) which has its principal place of business at 9120 Cardiff Road, Richmond, Virginia.  Parson, Jr. is the sole owner and managing member of SP-RCC.

2

6.      YES Behavioral Health, Inc. ("**YES**") is a Virginia corporation which has its principal place of business at 9120 Cardiff Road, Richmond, Virginia.  Parson, Jr. is the President of YES.

7.      Life Changers Mental Health and Supportive Services of Virginia, Inc. ("**Life Changers**") is a Virginia corporation which has its principal place of business at 9120 Cardiff Road, Richmond, Virginia.  Parson, Jr. is the President of Life Changers.

8.      Mark Parson ("**Mark Parson**") is Pastor Parson's son residing in Ohio.

9.      Anthony P. Fisher ("**Pastor T**") is an individual residing at 12200 Revere Avenue, Cleveland, Ohio.

10.     Pamela Ann Fisher ("**Ms. Fisher**") is an individual residing at 1350 W. Market Street, Akron, Ohio, and on information and belief is a relative of Pastor T.

11.     Commercial Mortgage City Corporation ("**CMC**") is a Florida corporation with its principal place of business located at 22860 Harrow Wood Court, Boca Raton, Florida.

12.     Jeffrey Lustbader ("**Mr. Lustbader**") is an individual residing in Boca Raton, Florida, and is the President of CMC.

13.     KSUS Group GP ("**KSUS**") is a New York corporation with its principal place of business located at 11 Prospect Avenue, Mount Vernon, New York.

14.     Ken Stevenson ("**Mr. Stevenson**") is an individual residing in New York and is the General Partner of KSUS.

**JURISDICTION AND VENUE**

15. The Court has jurisdiction over the case and this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3

16. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

17. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

18. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(E).

**Factual background relevant to Pastor Parson, Pastor T, and Pamela Fisher**

19. On or about November 26, 2014, Pastor Parson transferred (by wire) $54,226.00 of estate funds ("**Omega Transfer**") to Omega Title Agency, LLC in Stow, Ohio. *See* Exhibit A.

20. Pastor Parson misrepresented to the Debtor that the funds were being transferred for the purpose of Pastor T assisting the Debtor in obtaining a refinance of its existing loan obligations. In fact, the Omega Transfer funds were used to help finance the purchase of residential real property located at 1360 W. Market St., Akron, Ohio, for the benefit of Pastor T's relative, Ms. Fisher, who took title to that property on December 4, 2014.

21. The Omega Transfer was not in the usual course of the Debtor's business and was made post-petition and without authorization of the Court or by the bankruptcy code.

22. The Trustee has made demand on Pastor Parson and Pastor T for return of the Omega Transfer but they have failed and refused to return the funds.

**Factual Background relevant to Pastor Parson and Mark Parson**

23. On or about November 5, 2014, Pastor Parson and Mark Parson transferred $25,000 of estate funds to themselves and have deposited the funds into Trader's Way Bank, a broker located in the Commonwealth of Dominica, involved the trading of foreign exchanges (the "**Forex Transfer**").

4

24.     The Forex Transfer funds have lost value due to the trading activity of Pastor Parson and Mark Parson.  *See* Exhibit B.

25.     The Forex Transfer was not in the usual course of the Debtor's business and was made post-petition and without authorization of the Court or by the bankruptcy code.

26.     The Trustee has made demand on Pastor Parson and Mark Parson for return of the Forex Transfer but they have failed and refused to return the funds.

27.     Additionally, each month since the filing of the Petition, the Debtor has paid for the lease of two BMW vehicles for use by Pastor Parson and Mark Parson. (the "**BMW Transfers**").

28.     The BMW Transfers with respect to Mark Parson were not in the usual course of the Debtor's business and were made post-petition and without authorization of the court or by the bankruptcy code.

29.     By Order dated October 3, 3014, the Debtor was prohibited from paying Pastor Parson "for any reason" absent court approval.  Thus, any BMW Transfers with respect to Pastor Parson after October 3, 2014, were made post-petition and without authorization of the court or by the bankruptcy code.

30.     Mark Parson has returned the BMW he was using to the Debtor.  Mark Parson failed to perform routine maintenance on the vehicle, damaging its value, and the lease payments are in arrears, and repossession of the vehicle by the lienholder is imminent.

31.     Pastor Parson remains in possession of the other BMW but has failed and refused to assume the lease payments, which are in arrears, and repossession of the vehicle by the lienholder is imminent.

### Factual Background relevant to Pastor Parson

32.    Between October 14 and 30, 2014, Pastor Parson transferred approximately $2,574 of estate funds to Dubli, Inc., an online "shopping network" located in Ft. Lauderdale, Florida (the "**Dubli Transfer**").  *See* <u>Exhibit C</u>.

33.    The Dubli Transfer was not in the usual course of the Debtor's business and was made post-petition and without authorization of the Court or by the bankruptcy code.

34.    On information and belief, Pastor Parson has received $3,201.95 in "commissions" from Dubli.

35.    Despite demand by the Trustee, Pastor Parson has failed to return the Dubli Transfer funds or commissions earned therefrom.

### Factual Background relevant to Pastor Parson, CMC, Mr. Lustbader, KSUS, and Mr. Stevenson

36.    On or about December 30, 2014, Pastor Parson transferred $10,755 of estate funds to KSUS, Mr. Stevenson, CMC, and/or Mr. Lustbader, for the purpose of obtaining a refinance of the Debtor's existing loan obligations (the "**KSUS Transfer**").  KSUS represented that such funds represented a "good faith deposit" in the amount of one-half percent of a potential loan amount of $2,155,000.  *See* <u>Exhibit D</u>.

37.    The KSUS Transfer was not in the usual course of the Debtor's business and was made post-petition and without authorization of the Court or by the bankruptcy code.

38.    The Debtor never entered into any refinance agreement as a result of any services provided by KSUS, Mr. Stevenson, CMC or Mr. Lustbader, who have continued to unlawfully withhold the KSUS Transfer funds despite demand by the Trustee for their return.

**Factual Background relevant to Parson, Jr., SP-RCC, YES, and Life Changers**

39.     The Debtor owns multiple parcels of real property located in and around 214
Cowardin Avenue, Richmond, Virginia (the "**Real Property**").  Prior to the commencement of
the Case, the Debtor entered into an agreement (the "**Agreement**") to lease portions of the Real
Property to SP-RCC for use in SP-RCC's business which was unrelated to that of the Debtor.  A
copy of the Agreement dated December 7, 2011, is attached hereto as Exhibit E.

40.     On information and belief, SP-RCC subleased the Real Property to YES and Life
Changers.

41.     Pursuant to the Agreement, SP-RCC, YES, and Life Changers were obligated to
pay monthly rent in the total amount of $13,698.58.  These monthly rent payments were to be
made directly to Foundation Capital Resources, Inc. ("**FCR**"), in connection with the Debtor's
mortgage obligation on the Real Property.

42.     Pursuant to paragraph 8 of the Agreement, SP-RCC, YES, and Life Changers
were responsible for performing all necessary repairs to the "heating, ventilation and air
conditioning" at the Real Property.  Rather than repair the existing equipment, SP-RCC, YES,
and Life Changers installed five new HVAC units (the "**HVAC Units**") at the Real Property.

43.     The HVAC Units constituted permanent fixtures in the Real Property which
became property of the Debtor.

44.     In or around April 2013, SP-RCC, YES, and Life Changers abruptly breached the
Agreement, ceased paying rent to the Debtor (via FCR), and vacated the Real Property.

45.     SP-RCC, YES, and Life Changers unlawfully removed the HVAC Units plus
additional kitchen and office equipment including a deep fryer, ice maker, microwave, copier,

scanner, fax machine, and printer (collectively, the "**Personal Property**") from the Real
Property and have continued to maintain possession of the Personal Property and deny the
Debtor access to it.

46.     SP-RCC, YES, and Life Changers have failed and refused to pay rent owed under
the Agreement in the amount of $3,068,481.92 plus late fees in the amount of $153,424.10 and
attorney's fees as provided in the Agreement.

47.     The Trustee has demanded that SP-RCC, YES, Life Changers, and Parson, Jr.
turn over the Personal Property to the Trustee and make the payments due under the Agreement.

48.     The prompt turnover of the Personal Property is essential to the proper
administration of these assets for the benefit of the creditors in this case.  The Personal Property
is essential to the value of the Real Property.

**COUNT I**
**Avoidance of Post-Petition Transfers Pursuant to 11 U.S.C. § 549**
**(Pastor Parson, Pastor T, Pamela Fisher)**

49.     The allegations set forth in paragraphs 1 through 48 above are incorporated herein
by reference.

50.     The Omega Transfer was not in the usual course of the Debtor's business and was
made post-petition and without authorization of the Court or by the bankruptcy code.

51.     Based on the foregoing, the Trustee is entitled to avoid the Omega Transfer
pursuant to section 549 of the Bankruptcy Code.

## COUNT II
### Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)
**(Pastor Parson, Pastor T, Pamela Fisher)**

52.    The allegations set forth in paragraphs 1 through 51 above are incorporated herein by reference.

53.    Upon the avoidance of the Omega Transfer under section 549 of the Bankruptcy Code, the Trustee may recover the Omega Transfer or the value thereof from Defendants or any mediate or immediate transferee pursuant to section 550(a) of the Bankruptcy Code.

## COUNT III
### Avoidance of Post-Petition Transfers Pursuant to 11 U.S.C. § 549
**(Pastor Parson, Mark Parson)**

54.    The allegations set forth in paragraphs 1 through 53 above are incorporated herein by reference.

55.    The Forex Transfer was not in the usual course of the Debtor's business and was made post-petition and without authorization of the Court or by the bankruptcy code.

56.    Based on the foregoing, the Trustee is entitled to avoid the Forex Transfer pursuant to section 549 of the Bankruptcy Code.

57.    The BMW Transfers to Mark Parson were not in the usual course of the Debtor's business and were made post-petition and without authorization of the Court or by the bankruptcy code.

58.    The BMW Transfers to Pastor Parson after the October 3, 2014 Order were not in the usual course of the Debtor's business and were made post-petition and without authorization of the Court or by the bankruptcy code.

**COUNT IV**
**Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)**
**(Pastor Parson, Mark Parson)**

59.    The allegations set forth in paragraphs 1 through 58 above are incorporated herein by reference.

60.    Upon the avoidance of the Forex Transfer and the BMW Transfers under section 549 of the Bankruptcy Code, the Trustee may recover the Forex Transfer and BMW Transfers or the value thereof from Defendants or any mediate or immediate transferee pursuant to section 550(a) of the Bankruptcy Code.

**COUNT V**
**Avoidance of Post-Petition Transfers Pursuant to 11 U.S.C. § 549**
**(Pastor Parson)**

61.    The allegations set forth in paragraphs 1 through 60 above are incorporated herein by reference.

62.    The Dubli Transfer was not in the usual course of the Debtor's business and was made post-petition and without authorization of the Court or by the bankruptcy code.

63.    Based on the foregoing, the Trustee is entitled to avoid the Dubli Transfer pursuant to section 549 of the Bankruptcy Code.

**COUNT VI**
**Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)**
**(Pastor Parson)**

64.    The allegations set forth in paragraphs 1 through 63 above are incorporated herein by reference.

65. Upon the avoidance of the Dubli Transfer under section 549 of the Bankruptcy Code, the Trustee may recover the Dubli Transfer or the value thereof from Defendants or any mediate or immediate transferee pursuant to section 550(a) of the Bankruptcy Code.

**COUNT VII**
**Avoidance of Post-Petition Transfers Pursuant to 11 U.S.C. § 549**
**(Pastor Parson, CMC, Mr. Lustbader, KSUS, Mr. Stevenson)**

66. The allegations set forth in paragraphs 1 through 65 above are incorporated herein by reference.

67. The KSUS Transfer was not in the usual course of the Debtor's business and was made post-petition and without authorization of the Court or by the bankruptcy code.

68. Based on the foregoing, the Trustee is entitled to avoid the KSUS Transfer pursuant to section 549 of the Bankruptcy Code.

**COUNT VIII**
**Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)**
**(Pastor Parson, CMC, Mr. Lustbader, KSUS, Mr. Stevenson)**

69. The allegations set forth in paragraphs 1 through 68 above are incorporated herein by reference.

70. Upon the avoidance of the KSUS Transfer under section 549 of the Bankruptcy Code, the Trustee may recover the KSUS Transfer or the value thereof from Defendants or any mediate or immediate transferee pursuant to section 550(a) of the Bankruptcy Code.

**COUNT IX**
**Turnover of Property of the Estate Pursuant to 11 U.S.C.§ 541**
**(Parson, Jr., SP-RCC, YES, Life Changers)**

71. The allegations set forth in paragraphs 1 through 70 above are incorporated herein by reference.

11

72.     Pursuant to § 541 of the Bankruptcy Code, the Personal Property constitutes property of the estate.

73.     The Trustee is entitled to turnover of the Personal Property or the value thereof from the Defendants pursuant § 542 of the Bankruptcy Code.

**COUNT X**
**Breach of Contract**
**(SP-RCC, YES, Life Changers)**

74.     The allegations set forth in paragraphs 1 through 73 above are incorporated herein by reference.

75.     In or around May 2013, SP-RCC, YES, and Life Changers defaulted on their obligations under the Agreement by failing and refusing to pay those amounts due and owing to the Debtor.

76.     By letter dated January 30, 2015, the Trustee notified SP-RCC, YES, and Life Changers of this default and requested they take immediate action to cure the default.

77.     SP-RCC, YES, and Life Changers have failed and/or refused to pay the outstanding amounts due to the Debtor.

78.     The actions described above constitute material breaches of the Agreement.

79.     As a direct result of these breaches of contract, the Debtor has been actually damaged in an amount to be proven at trial, but not less than $3,068,481.92, plus late fees in the amount of $153,424.10, attorney's fees as provided in the Agreement, plus costs.

**RESERVATION OF RIGHTS**

80.     The Trustee hereby specifically reserves the right to bring any and all other causes of action that he may maintain against Defendants including, without limitation, causes of action

arising out of the same transaction(s) set forth herein, to the extent discovery in this action or further investigation by the Trustee reveals such further causes of action.

WHEREFORE, the Trustee, by counsel, respectfully prays for the entry of an order against Defendants that provides for:

(1)    Avoidance and immediate recovery of the Omega Transfer, Forex Transfer, BMW Transfers, Dubli Transfer, and KSUS Transfers (collectively the "**Transfers**") pursuant to sections 549 and 550 of the Bankruptcy Code;

(2)    Judgment against the Defendants in the amount of the value of the respective Transfers; plus post-judgment interest;

(3)    Judgment determining the Personal Property is property of the estate and immediate recovery of the Personal Property or the value thereof from Parson, Jr., SP-RCC, YES, and Life Changers;

(4)    Judgment against SP-RCC, YES, and Life Changers for their breach of the Agreement in the principal amount of $3,068,481.92, plus late fees in the amount of $153,424.10, and attorney's fees as provided in the Agreement, plus costs;

(5)    An award of costs and disbursements incurred by the Trustee in this action; and

(6)    An award of such other relief as may be just and proper.

DATED:  March 31, 2015                           BRUCE H. MATSON, CHAPTER 11
TRUSTEE


/s/ Christopher L. Perkins
Counsel

Christopher L. Perkins (VA Bar No. 41783)
Christian K. Vogel (VA Bar No. 75537)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 783-7550

*Counsel to Bruce H. Matson, Chapter 11 Trustee*

# **EXHIBIT A**

# Wire Transfer Services

## Outgoing Wire Transfer Request

| Today's Date: | Created After Deadline: | | Wells Fargo Reference Number: |
|---|---|---|---|
| 11/26/2014 | No | | ▆▆▆▆2490 |
| Banker Name: | | | Officer/Portfolio Number: |
| Slach, Jasvinder | | | V3645 |
| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
| 804/378-9690 | 07330 | 0068943 | R3532-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC") and the International Bank Account Number ("IBAN").

## Originator's Information

| Customer Name: | | | Street Address: | |
|---|---|---|---|---|
| STEPHEN A PARSON SR | | | 214 COWARDIN AVE | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | |
| PINV | PIN Validation | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | |
| | | | | |
| Secondary ID Type: | Secondary ID Description: | | City: | State: |
| DLIC | ▆▆▆▆▆▆▆ | | RICHMOND | VA |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| VA | 03/22/2011 | 09/03/2017 | 23224-2075 | US |
| Business, Trust, or Estate Name: | | | Home Phone: | Business Phone: |
| FAITH ALIVE INTERNATIONAL MINISTRIES | | | | 804/301-0600 |

## Wire Amount and Source of Funds

| Create AU: | | | | |
|---|---|---|---|---|
| 0068943 | $54,226.00 | 2515296610 | | 00377 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| omega title agency | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| ▆▆▆▆▆8277 | |
| Information/Comments: | Name/Address Line 3: |
| | |
| | Beneficiary Phone Number: |
| | |

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | |
|---|---|---|---|
| 042000314 | | FIFTH THIRD BANK | |
| Beneficiary Bank Address: | | City: | State: |
| | | CINCINNATI | OH |

WTR6603 (11-13 SVP)

**<u>EXHIBIT B</u>**



# **EXHIBIT C**

| Account # | Name | Item | Paid to Dubli via CC | Paid to Parson | Funds in Account |
|---|---|---|---|---|---|
| | Mr. Stephen Parson Sr. | | | | |
| | | 10/9/2014 Monthly V.I.P. Qualification Voucher | $99.00 | | |
| | | 10/24/2014 Commission | | $301.95 | |
| | | 10/31/2014 Commission | | $1,301.00 | |
| | | 11/20/2014 Commission | | $1,599.00 | |
| | | 3/6/2015 Amount in account | | | $83.74 available and $46.71 pending |
| | Mr. Steve Parson Sr. (Corporate name is: Richmond Christian Center) | | | | |
| | | 10/30/2014 TLA Upgrade | $1,881.00 | | |
| | | 10/14/2014 National one-year V.I.P | $495.00 | | |
| | | 10/14/2014 Business License | $99.00 | | |
| | | 3/6/2015 Amount in account | | | No withdrawals on network |
| | Totals | | $2,574.00 | $3,201.95 | |

# **EXHIBIT D**

## KSUS GROUP GP

11 PROSPECT AVENUE 3RD FLOOR MOUNT VERNON, NY 10550
(646) 780-9695

12/30/2014

Richmond Christian Center
214 Cowardin Ave
Richmond, VA

Loan Reference: 222rc7856va

BORROWER:   Richmond Christian Center and
Dr. Steve Parsons

LOAN AMOUNT:   $2,155,000 or 50% of Appraised value

INTEREST RATE:       12%

TERM RATE:        12 months

ORIGINATION FEE:    3%

CONSULTING FEE:     3%

EXIT FEE:         TBD

EXTENSION OPTION FEE: TBD

GUARANTOR(S):      Dr. Steve Parsons co-signer may be
required.

GOOD FAITH DEPOSIT:  ½% of loan amount        *10,775*

MAXIMUM LTV:        50% of Appraised Value

### Financial Reporting Requirements:

Operating statements of the Borrower and personal financial
statements, including copies of Federal Income Tax Returns, of the
Guarantor will be Required. All leases, annual operating statements,

rent rolls, and other financial information requested by Lender concerning the Property.

**Breakup Fee:**

In the event that Lender is prepared to close the Loan upon terms substantially in accordance with the term sheet and Borrower elects to pursue financing with another party, a breakup fee of two percent (2.00%) of Lender's Loan Amount shall be immediately due and payable to Lender.

**Expiration of Term**

This Term Sheet shall be deemed null and void if an executed copy, along with the required Good Faith Deposit specified herein, is not delivered to Lender by 5:00 PM EST on January 6, 2014.

**Term Sheet**

Borrower understands and agrees that this Term Sheet is provided preliminarily and is not a commitment of any kind. As such, the terms set forth herein are not binding upon Lender. Lender may withdraw from such discussions at any time and for any reason in Lender's sole and absolute discretion. Borrower further understands and agrees that Lender is not obligated to enter into the transaction contemplated by this Term Sheet, on the terms set forth herein or on any other terms, unless and until Borrower executes and delivers final documentation (in its sole and absolute discretion), the terms of which shall supersede in their entirety the terms set forth herein. Notwithstanding the foregoing, Borrower hereby acknowledges and agrees that Borrower's obligations to reimburse Lender for all Loan Expenses, shall be binding upon Borrower and Guarantor. The Lender can assign this term sheet to a third party for the purpose of consummating this loan at its sole purpose.

**LOAN CLOSING:**

This loan closing can occur within 14 business days of signed term sheet after all required documents have been received by Lender from borrower with proof of the ability to pay all debt that exceeds loan amount and title insurance commitment to insure that lender

12/30/2014

has first lien position on all assets listed in the appraisal provided to lender from borrower that states a market value of $4,283,000 as of November 7, 2014 signed by John H. Saunders.

Borrower also agrees to provide all documentation required to lender in a timely manner.

Acknowledged by signatures below:


**Richmond Christian Center**

_____   Date:_____

By: Steve Parsons        Title:_____


**KSUS GROUP GP**

_Ken Stevenson_          Date:__12/30/14__

By Ken Stevenson         Title:  General Partner

## **EXHIBIT E**

## LEASE – PURCHASE AGREEMENT

THIS LEASE – PURCHASE AGREEMENT is dated December 7th, 2011 (this "Agreement") between RICHMOND CHRISTIAN CENTER a/k/a FAITH ALIVE INTERNATIONAL MINISTRIES, a/k/a FAITH ALIVE MINISTRIES, a Virginia unincorporated association ("Landlord") and SP – RCC PROPERTIES, LLC, a Virginia limited liability company ("Tenant").

### RECITAL

Landlord desires to lease to Tenant and Tenant desires to lease from Landlord the premises known as (1) 214, 216, 219, 221, 223, 225 and 227 Cowardin Avenue, Richmond, VA 23224, (2) 1720, 1721, 1901 and 1910 Wall Street, Richmond, VA 23224, (3) 201, 208, 210, 215, 217, 218, 219 and 318 West 19th Street, Richmond, VA 23224, (4) 1916 Bainbridge Street, Richmond, VA 23224, (5) 1919 Porter Street, Richmond, VA 23224 and (6) 310 Stockton Street, Richmond, VA 23224 (the "Leased Premises").

NOW, THEREFORE, for and in consideration of the terms, conditions, covenants, promises and agreements herein made, Landlord hereby leases and demises unto Tenant the Leased Premises.

1. <u>Term</u>. The term of this Agreement and Tenant's obligation to pay rent hereunder shall commence on January 1, 2012 and end on December 1, 2031 (the "Lease Term") at which time the Tenant, may in its discretion complete the purchase by paying off the remaining balance in accordance with the Landlord's loan (20-year balloon) or have the Landlord refinance its loan with Foundation Capital Resources ("FCR") and continue the Lease Term accordingly under the same conditions herewith. The term of this Agreement shall be for the term of the Landlord's and Tenant's loan with FCR dated December 7th, 2011 (the "Loan"). Landlord may not refinance the Loan with FCR or otherwise encumber any part of the Leased Premises unless Landlord obtains Tenant's approval to refinance the Loan.

2. <u>Rent</u>.

(a) <u>Monthly Rent</u>. During the term of this Agreement, Tenant covenants to pay base rent in the amount of THIRTEEN THOUSAND SIX HUNDRED NINETY EIGHT AND 58/100 DOLLARS ($13,698.58) or an amount commensurate with Landlord's monthly debt service due and payable on or before the first (1st) day of each month ("Monthly Rent"), without notice or demand and without setoff. See Attachment A for applicable payment schedule.

(b) <u>Late Payment and Returned Check Charges</u>. If the Monthly Rent is not received by Landlord on or before the fifteenth (15th) day of each rental month, then Landlord shall impose upon Tenant a late charge of five percent (5%) of the Monthly Rent. Additionally, a returned check charge of THIRTY AND NO/100 DOLLARS ($30.00) will be imposed against Tenant for each check Tenant tenders for

Monthly Rent and/or any other payment due Landlord that Landlord is compelled to return for any reason. Charges for late rent payments and returned checks are intended to offset the costs incurred by Landlord in processing late and unfulfilled rent payments and are not imposed as a penalty.

3.    Rent Recipient. All payments due under this Agreement shall be remitted directly to the mortgage company of **Foundation Capital Resources at 1661 North Boonville Avenue, Springfield, Missouri 65803 or its agent (AG Financial).**

4.    Purchase Option.

(a)    Purchase Price and Deposit. Landlord hereby grants to Tenant the option to purchase the Leased Premises for **ONE AND NO/100 DOLLAR** (the "Purchase Price") on the condition that Tenant pays Landlord the Monthly Rent (defined below) due under this Agreement for the Lease Term.

(b)    Refusal to Deliver Possession. Landlord may elect not to deliver Tenant possession of the Leased Premises until all rent due and owing under this Agreement is paid in full by Tenant.

(c)    Grounds for Rescinding Purchase Option. Landlord may rescind the Purchase Option upon any event of default as prescribed under Section 22(a) of this Agreement and avail itself of any and all default remedies provided under said paragraph to include, without limitation, the filing of legal action to obtain possession of the Leased Premises and judgment for all monies then due and owing Landlord.

(d)    Termination of Purchase Option; Closing Deadline. The Purchase Option prescribed herein shall be effective without notice upon the termination of the Lease Term on December 1, 2031 or extended as set forth under Section 1 of this Agreement. Tenant shall have ninety (90) days after the termination of the Lease Term (unless extended in Section 1) to close on the purchase transaction for the Leased Premises (the "Closing Date").

(e)    Extension of Purchase Option. Landlord may extend the Purchase Option beyond the Closing Date set forth in Section 4(d) of this Agreement for any period of time up to but not to exceed ten (10) years under the same terms and conditions set forth herein.

(f)    Closing Costs and Conditions. The transfer of title of the Leased Premises shall occur in the offices of Landlord's legal counsel or such other place as mutually acceptable to both Landlord and Tenant. Landlord shall be responsible for paying the attorney's fees and costs it incurs in connection with the sale of the Leased Premises, including, without limitation, the grantor's tax. Tenant shall pay its attorney's fees and all other costs associated with the sale of said property to include, without limitation, recordation fees, title examination fee and survey fees. Landlord agrees to execute and deliver to Tenant all documents as shall be reasonably required by Tenant to receive right, title and interest in and to the Leased Premises.

2



(g)    Payments Credited to Purchase Price.    Landlord and Tenant agree that the payment of the Monthly Rent provided in Section 2(a) of this Agreement that is paid by Tenant shall be applied to the payment of the debt service under the Loan.

5.    Security Deposit.    [Intentionally Deleted]

6.    Use of Premises.    Tenant shall use the Leased Premises for commercial business purposes only. Tenant covenants to abide by all applicable laws and zoning ordinances. Tenant shall insure that all persons and/or entities subletting the Leased Premises or any portion thereof shall abide by the use restrictions set forth herein and all applicable laws and zoning ordinances.

7.    Services, Utilities, Taxes and Other Costs.    Landlord shall be responsible for procuring and paying for all services and utilities provided to the Leased Premises, including, without limitation, electricity, water (including sewer) and any other miscellaneous utility bills and deposits. Tenant shall pay the taxes, if any, and governmental charges of any kind whatsoever that may be lawfully assessed, levied or imposed against the Leased Premises during the Lease Term. If Tenant fails to timely fulfill its payment obligations herein, then Landlord may seek reimbursement from Tenant for any payment that Landlord elects to advance, at its sole discretion, to preserve the condition of the Leased Premises and/or Landlord's interest therein, which shall include, without limitation, any payment advanced by Landlord to stem the cessation of any services to the Leased Premises or preclude the imposition of any liens, fines or fees affecting Landlord or the Leased Premises.

8.    Maintenance and Repairs.    Tenant shall be responsible for performing and paying for any and all necessary repairs to the Leased Premises primarily used and attributable to include, without limitation, any repairs to the heating, ventilation and air conditioning unit servicing the Leased Premises as well as any structural repairs to the Leased Premises necessary to preserve the health and safety of occupants and insure compliance with any applicable building codes, statutes and ordinances. Tenant shall otherwise maintain the Premises in good order and repair during its occupancy and will, at the expiration of the Lease Term, deliver up the Premises in as good order and condition as received, reasonable wear and tear excepted, provided that Tenant has not purchased the Leased Premises within the timeframe allotted herein at Section 4. If Tenant fails to timely perform its obligations herein, then Landlord may seek reimbursement from Tenant for any payment that Landlord elects to advance, at its sole discretion, to preserve the condition of the Leased Premises and/or Landlord's interest therein, which shall include, without limitation, any payment advanced by Landlord to prevent deterioration or waste with respect to the Leased Premises, preclude the imposition of any liens, fines or fees affecting Landlord or the Leased Premises or remedy any defective condition that could potentially give rise to liability exposure.

9.    Furnishings, Fixtures, Alterations and Improvements.    Tenant shall have the right to make any interior or exterior alterations, changes or improvements to the Leased Premises without Landlord's prior written consent. All such approved alterations, changes and improvements, including additional fixtures and furnishings, shall be done in

3

a workmanlike manner in accordance with applicable laws and building codes at Tenant's own expense and shall be removed by Tenant at Tenant's own expense upon the expiration or termination of the Lease Term provided that Tenant has not purchased the Leased Premises within the timeframe allotted herein at Section 4. Tenant shall repair any damage to the Leased Premises caused by its alterations, changes or improvements to the Leased Premises, including, without limitation, any damage resulting from the installation or removal of any fixtures or furnishings should Tenant not timely exercise its option to purchase the Leased Premises. All added fixtures and furnishings that Tenant fails to remove upon the termination or expiration of the Lease Term shall, at Landlord's option, become the property of Landlord provided that Tenant has not timely exercised its option to purchase the Leased Premises.

10.     <u>Insurance; Compliance with Laws.</u>

(a)     Tenant shall maintain at its sole cost and expense the following insurance with respect to the Leased Premises:

(i)     Contractual and commercial general liability insurance against claims for bodily injury, or death occurring on, in or about the Leased Premises, which insurance shall be written on an occurrence basis and shall provide protection with a combined single limit of **TWO MILLION AND NO/100 DOLLARS ($2,000,000.00)** (or in such increased limit to reflect declines in the purchasing power of the dollar as Landlord may, from time to time, reasonably request).

(ii)     Insurance for Tenant's furniture, furnishings, equipment, improvements and trade fixtures located in the Leased Premises under a standard fire and extended coverage insurance policy, in amounts to prevent Landlord and Tenant from becoming co-insurers, and in any event, in amounts not less than the actual replacement cost of such property. Landlord shall not be responsible for providing insurance of any kind on Tenant's furniture and furnishings or its equipment, improvements or trade fixtures and Tenant shall be solely liable to repair or replace the same in the event of damage or destruction to the Leased Premises.

(iii)     Such additional and/or other insurance in such amounts as is requested by Landlord and customarily carried by prudent tenants with respect to improvements similar in character, location and use.

(b)     Landlord shall maintain at its sole cost property and casualty insurance on total premises in accordance with FCR loan agreement to cover replacement value of total property or current loan balance whichever is greater.

(c)     Each policy of insurance required by this Section shall name Landlord and/or Tenant if applicable, and any person or entity having an interest in the Leased Premises and designated by Landlord as insured parties and shall provide that the insurer shall not cancel or change the terms of such insurance policy without first giving Landlord, and other insureds thirty (30) days' prior written notice thereof. The insurance

4



policies shall be issued by an insurance company, licensed to do business in Virginia, and approved by Landlord.

     (d)    Tenant shall not do or allow to be done in or about the Leased Premises anything which is prohibited under any policy of insurance carried by Landlord. If Tenant's use or occupancy of the Leased Premises causes the premium for fire or other insurance carried by Landlord to be higher than the premium otherwise payable for such insurance, Tenant shall be obligated to the pay the difference to Landlord upon demand.

     (e)    Tenant shall at all times and at its expense, promptly comply with, or promptly cause to be complied with, all applicable laws, rules, regulations and other governmental requirements, now existing or hereafter enacted, to which Tenant or the Leased Premises is subject.

    11.    Landlord's Access to Leased Premises. Landlord shall have the right at all reasonable times to enter the Leased Premises to perform maintenance, repairs and alterations to preserve the Leased Premises and Landlord's interest therein as contemplated under Section 8 of this Agreement. If Tenant is not present to open and permit entry to the Leased Premises at any time when for any reason entry therein is necessary or permissible hereunder, Landlord may use a master key to enter the Leased Premises.

    12.    Surrender of Possession. Tenant shall, at the expiration of the Lease Term or termination of this Agreement, surrender possession of the Leased Premises peacefully and promptly in as good condition as at the commencement of its occupancy, reasonable wear and tear excepted. Tenant shall surrender all keys used in connection with the Leased Premises.

    13.    Tenant's Personal Property.

     (a)    All property of Tenant kept or stored in the Leased Premises shall be kept or stored at the sole risk of Tenant.

     (b)    Tenant agrees to notify Landlord immediately of any fire or other casualty or known defect in the Leased Premises, including any improvements, fixtures, or equipment located thereon.

     (c)    Tenant shall be responsible for and shall pay when due all municipal, city or state taxes assessed during the term of this Agreement against any leasehold interest or personal property of any kind, owned by or placed in the Leased Premises by Tenant.

    14.    Indemnification. Tenant agrees to indemnify and hold Landlord and Landlord's affiliated entities and their respective directors, officers, agents and employees harmless from all claims, actions, damages, liability and expense in connection with loss of life, injury to persons and damage to property arising in or about the portion of the Leased Premises occupied or used by Tenant. Tenant further agrees to indemnify and hold Landlord and Landlord's affiliated entities and their respective



5

directors, officers, agents and employees harmless from all claims, actions, damages, liability and expense in connection with any claims stemming from Tenant's failure to uphold any payment obligation set forth herein.

15.    Attornment.  In the event of the exercise of any power of sale under the provisions of any mortgage or deed of trust now or hereafter encumbering the Leased Premises, or a transfer of the Leased Premises in lieu thereof, Tenant agrees that, if requested by the purchaser at such foreclosure sale or by the transferee, it shall attorn to the purchaser or transferee and it shall recognize such purchaser or transferee as Landlord under the terms of this Agreement and shall continue this Agreement in full force and effect regardless of whether such mortgage or deed of trust was superior or subordinate to this Agreement.

16.    Subordination.  This Agreement is subject and subordinate to the lien and the provisions of any and all mortgages, deeds of trust and other security instruments which may now or hereafter encumber or otherwise affect the Leased Premises, and to all renewals, replacements, extensions and modifications thereof.    The foregoing subordination shall be self-operative and effected by execution of this Agreement.  Upon request by Landlord, Tenant agrees to confirm the subordination of its rights hereunder to any mortgage or deed of trust or any other security instrument resulting from any method of financing now or hereafter affecting the Leased Premises and to all advances made or hereafter to be made thereunder.  Notwithstanding the foregoing, the beneficiary of any deed of trust on the Leased Premises may, at its option, subordinate at any time its deed of trust to this Agreement by executing and recording a unilateral declaration to such effect.

17.    Assignment and Subletting.  Tenant shall not mortgage or assign this Agreement, in whole or in part without the prior written consent of Landlord.  Tenant shall not sublet all or any part of the Leased Premises without the prior written consent of Landlord, which consent may not be unreasonably withheld.  This prohibition on assignment and subletting shall include a prohibition against any assignment or subletting by operation of law.  Any consent given by Landlord to any mortgage, assignment or subletting by Tenant shall not constitute a waiver of the requirement for such consent to any subsequent mortgage, assignment or subletting, nor shall Tenant be released from performing any of the terms, covenants and conditions of this Agreement.

18.    Tenant's Right to Negotiate and Collect Rents.  If Landlord authorizes Tenant to enter into a sublet arrangement for the Leased Premises or any portion thereof, Tenant will be authorized to negotiate the rent to be paid by the subtenant and shall be responsible for enforcing and collecting rent payments.  Tenant may also re-negotiate, at its discretion, and collect rent from any subtenant(s) already occupying any portion of the Leased Premises at the commencement of this Agreement.  Tenant shall be entitled to keep all rent payments collected in connection with any authorized subtenant arrangement and apply  these proceeds as it sees fit provided that Tenant is not in violation of any payment obligation under this Agreement.

19.    Damage or Destruction.

6

(a)      If the Leased Premises are damaged by fire or other casualty, but no portion thereof is thereby rendered untenantable for the Tenant's intended use and purpose for the Leased Premises then Landlord shall cause such damage to be repaired at Landlord's expense and the Monthly Rent shall not be abated.

(b)      If by reason of fire or other casualty, a portion of the Leased Premises are rendered untenantable for Tenant's intended use and purpose for the Leased Premises then Landlord shall cause such damage to be repaired at Landlord's expense and the Monthly Rent shall be adjusted on a pro-rata basis for the period of such repair and restoration to that portion of the Leased Premises rendered untenantable provided that such fire or casualty is directly attributable to Landlord's negligence, recklessness or intentional misconduct.

(c)      If Landlord's negligence, recklessness or intentional misconduct results in a fire or other casualty that completely destroys and/or totally renders the Leased Premises untenantable for Tenant's intended use and purpose, then Tenant shall have the right for thirty (30) days following the date of the fire or other casualty to unilaterally terminate this Agreement by giving Landlord thirty (30) days' advance written notice of the termination.

20.     Eminent Domain.  If all or part of the Leased Premises is taken or condemned by any authority or in the event of any purchase in lieu of any such taking or condemnation, this Agreement shall terminate as of the date on which Tenant is deprived of possession of the Leased Premises. Landlord shall be entitled to recover any award paid for the taking of the Leased Premises, in whole or in part, or any damage thereto and/or any money paid pursuant to a negotiated sale of the property under the threat of condemnation except that Tenant shall be entitled to recover a portion of these proceeds equal to the percentage of the Purchase Price Tenant would be credited as paying at the time of the taking or sale of the Leased Premises as per the formulation prescribed in Section 4(g) of this Agreement.  Tenant shall bear the cost of removing its property from the Leased Premises.

21.     Environmental Hazards.  Tenant will not on, about or under the Leased Premises, handle, store, make, treat or dispose of any "Hazardous Materials" (defined below), except in accordance with all applicable federal, state and municipal laws and regulations (collectively, the "Environmental Laws") governing Hazardous Materials. "Hazardous Materials" as used herein shall include, without limitation, "hazardous substances" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under CERCLA; hazardous waste as defined under the Solid Waste Disposal Act, as amended, 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, et seq.; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 125, et seq., any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, et seq., any hazardous chemical substance or mixture or imminently hazardous

7



substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, *et seq.*; any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

During the term of this Agreement, to the extent at any time required by the Environmental Laws, Tenant shall remove any Hazardous Materials placed, generated or stored by it on or about the Leased Premises, and Tenant shall defend, indemnify and hold Landlord and Landlord's affiliated entities and their respective directors, officers, agents, representatives and employees harmless from and against any and all causes of action, suits, demand or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including, but not limited to, attorneys' fees and costs of litigation) arising out of or in any manner connected with the violation of any applicable federal, state or local environmental law with respect to the Leased Premises; the handling, storage, "release" or "threatened release" of or failure to remove, as required by this Section, Hazardous Materials from the Leased Premises.

Tenant represents and warrants that it will not install any underground storage tank without specific, prior written approval from Landlord. Tenant will not store combustible or flammable materials on the Leased Premises in violation of the Environmental Laws.

22.    Default; Remedies upon Default.

(a)    Events of Default.  Any one or more of the following events shall constitute a default ("Default") under this Agreement:

(i)    Failure by Tenant to pay Monthly Rent and/or any accumulated late fees or related charges as required under Section 2 of this Agreement prior to the expiration of the thirty (30) day grace period alluded to in Section 2(b) of this Agreement.

(ii)    Failure by Tenant to make any payment required under this Agreement other than the payment of Monthly Rent and/or any accumulated late fees or related charges within any applicable timeframe called for herein.

(iii)    Failure by Tenant to observe or perform any covenant or condition of this Agreement or as otherwise required by law other than the payment obligations referred to in clauses (a)(i) and (a)(ii) above, which failure shall continue for a period of thirty (30) days after written notice of such failure is given by Landlord to Tenant.

(iv)    Tenant filing for or threatening to file for bankruptcy or otherwise making any assertion or representation of insolvency.

(b)    Remedies upon Default.

8



(i)     Whenever any Default shall have occurred, Landlord may take any one or more of the following actions:

a.      Landlord may issue a written notice to Tenant advising of any payment default described in subsections (a)(i) and (a)(ii) which serves to provide Tenant thirty (30) days to either cure the payment default or quit the Leased Premises.  To the extent that Tenant remains in possession of the Leased Premises yet fails to timely remedy the payment default prior to the expiration of the thirty (30) day cure period, then this Agreement shall be deemed terminated and Landlord may immediately proceed with the filing of legal action to obtain judgment for all monies then due and owing and/or an Order of Possession of the Leased Premises.

b.      Landlord may immediately terminate this Agreement and declare all payments of Rent due from the date of termination through the date that would otherwise have been the normal expiration of this Agreement to be immediately due and payable.

c.      Landlord may not exercise rights of self-help.

(ii)     No re-entry or taking possession of the Leased Premises by Landlord shall be construed as an election by Landlord to terminate this Agreement unless (i) written notice of such termination is given by Landlord to Tenant, or (ii) this Agreement is terminated by an order or a decree of a court of competent jurisdiction. Notwithstanding any re-entry and taking of possession by Landlord of all or any part of the Leased Premises without terminating this Agreement, Landlord may at any time thereafter elect to terminate this Agreement for any previous Default by Tenant.  Upon any re-entry and taking possession of the Leased Premises by Landlord, or upon any termination of this Agreement, any property of Tenant may be removed by Landlord, without liability for loss of or damage to said property, and stored elsewhere at the risk of and at the expense of Tenant.

(iii)     Upon a Default, Tenant shall be liable to pay Landlord all reasonable attorney's fees, court costs and other reasonable expenses incurred by Landlord in the collection of Monthly Rent and/or the enforcement of any other obligations of Tenant.  Upon a Default, Tenant shall also be liable to pay Landlord all reasonable expenses incurred by Landlord in attempting to cure the Default by the exercise of self-help.

(iv)     No delay or omission by Landlord in exercising any right accruing upon a Default shall be construed to be a waiver of any such right, but any such right may be exercised from time to time as often as deemed expedient.

23.     Force Majeure.  If by reason of acts of God, strikes, lockouts or other industrial disturbances; acts of public enemies; orders of any kind of the government of the United States or the Commonwealth of Virginia, or any civil or military authority; insurrections; riots; epidemics; landslides; lightning; earthquakes; fires; hurricanes; tornadoes; blizzards, or other storms; floods, washouts; droughts; arrests; restraint of



government and people; civil disturbances; explosions; breakage or accident to machinery; partial or entire failure of utilities; or any cause or event not reasonably deemed to be within the control of Landlord, Landlord is unable in whole or in part to carry out its agreements contained in this Agreement, Landlord shall not be deemed in Default during the continuance of such inability.

24.    Successors.    Subject to the provisions of this Agreement prohibiting or restricting the right of Tenant to encumber, sublease or assign its interests under this Agreement and the provisions of Section 17, this Agreement shall be binding upon and inure to the benefit of Landlord and Tenant and their respective successors and assigns.

25.    Non-Waiver.    The failure of Landlord, to enforce strict compliance with any of the terms and conditions of this Agreement shall not constitute or be construed as a waiver or relinquishment of the right to enforce strict compliance thereafter with the terms and conditions of this Agreement.    The payment of rent by Tenant or the acceptance of rent by Landlord, with knowledge of the breach of any term or condition of this Agreement, shall not be deemed a waiver of such breach.

26.    Notices.    All notices required or permitted by this Agreement shall be in writing and hand delivered or sent by regular mail and addressed as follows:

If to Landlord:

        Richmond Christian Center
        214 Cowardin Avenue
        Richmond, Virginia  23224
        Attn:  Angela Page


If to Tenant:

        SP – RCC Properties, LLC
        P.O. Box 74051
        Richmond, Virginia  23236
        Attn:  Stephen A. Parson, Jr.


        Either party may, at any time, designate in writing a substitute address for the address set forth above, and thereafter notices shall be directed to such substitute address.

27.    Not used.

28.    Landlord's Representations and Warranties.    Tenant acknowledges and agrees that, except as otherwise expressly provided herein, it is leasing and subsequently acquiring the Leased Premises in an "AS IS" and "WHERE IS" condition, and without express or implied representations or warranties of any kind or nature whatsoever, specifically including, but not limited to, express or implied representations or warranties

10



for a particular purpose, habitability, merchantability and/or title.

29.    Severability.  It is the intention of the parties that the provisions of this Agreement shall be enforceable to the fullest extent permissible under law. If any clause or provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, then the remainder of this Agreement shall not be affected thereby, and this Agreement shall be construed in all respects as if such illegal, invalid or unenforceable provision were omitted.  If any clause or provision contained in this Agreement is held to be in violation of law, then there shall be added as part of this Agreement a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible, which is legal, valid and enforceable.

30.    Counterparts.  This Agreement shall be valid if executed in counterparts, the same as if executed in one document by all parties. Facsimiles of this signed Agreement shall be treated as an original for purposes of enforcement of the obligations of the parties hereto.

31.    Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

32.    Entire Agreement.   This Agreement constitutes the entire full and complete understanding and agreement of the parties and all representations, conditions, statements, warranties, covenants, promises or agreements previously made or given by either party to the other are expressly merged into this written Agreement and shall be null, void and without legal effect.  This Agreement shall not be altered, amended or modified except by written agreement of the parties hereto.

11

WITNESS the following signatures:

RICHMOND CHRISTIAN CENTER
a/k/a FAITH ALIVE INTERNATIONAL
MINISTRIES, a Virginia unincorporated
association

By: _____

Name: Dr. Stephen A. Parson, Sr.

Title:  Pastor/Trustee


RICHMOND CHRISTIAN CENTER
a/k/a FAITH ALIVE INTERNATIONAL
MINISTRIES, a Virginia unincorporated
association

By: _____

Name: Dr. Rhonda D. Hickman

Title:  Secretary/Trustee


SP – RCC PROPERTIES, LLC, a
Virginia limited liability company

By: _____

Name: Stephen A. Parson, Jr.

Title:  Managing Member

12

Attachment A

## Amortization Schedule

| Month | Interest | Principal | Balance |
|-------|----------|-----------|---------|
| Jan, 2012 | $12,010.83 | $1,687.75 | $2,057,312.25 |
| Feb, 2012 | $12,000.99 | $1,697.59 | $2,055,614.66 |
| Mar, 2012 | $11,991.09 | $1,707.49 | $2,053,907.17 |
| Apr, 2012 | $11,981.13 | $1,717.45 | $2,052,189.72 |
| May, 2012 | $11,971.11 | $1,727.47 | $2,050,462.25 |
| Jun, 2012 | $11,961.03 | $1,737.55 | $2,048,724.70 |
| Jul, 2012 | $11,950.89 | $1,747.68 | $2,046,977.01 |
| Aug, 2012 | $11,940.70 | $1,757.88 | $2,045,219.13 |
| Sep, 2012 | $11,930.44 | $1,768.13 | $2,043,451.00 |
| Oct, 2012 | $11,920.13 | $1,778.45 | $2,041,672.55 |
| Nov, 2012 | $11,909.76 | $1,788.82 | $2,039,883.73 |
| Dec, 2012 | $11,899.32 | $1,799.26 | $2,038,084.48 |
| Jan, 2013 | $11,888.83 | $1,809.75 | $2,036,274.72 |
| Feb, 2013 | $11,878.27 | $1,820.31 | $2,034,454.41 |
| Mar, 2013 | $11,867.65 | $1,830.93 | $2,032,623.49 |
| Apr, 2013 | $11,856.97 | $1,841.61 | $2,030,781.88 |
| May, 2013 | $11,846.23 | $1,852.35 | $2,028,929.53 |
| Jun, 2013 | $11,835.42 | $1,863.16 | $2,027,066.37 |
| Jul, 2013 | $11,824.55 | $1,874.02 | $2,025,192.35 |
| Aug, 2013 | $11,813.62 | $1,884.96 | $2,023,307.39 |
| Sep, 2013 | $11,802.63 | $1,895.95 | $2,021,411.44 |
| Oct, 2013 | $11,791.57 | $1,907.01 | $2,019,504.43 |
| Nov, 2013 | $11,780.44 | $1,918.14 | $2,017,586.29 |
| Dec, 2013 | $11,769.25 | $1,929.33 | $2,015,656.97 |
| Jan, 2014 | $11,758.00 | $1,940.58 | $2,013,716.39 |
| Feb, 2014 | $11,746.68 | $1,951.90 | $2,011,764.49 |
| Mar, 2014 | $11,735.29 | $1,963.29 | $2,009,801.20 |
| Apr, 2014 | $11,723.84 | $1,974.74 | $2,007,826.46 |
| May, 2014 | $11,712.32 | $1,986.26 | $2,005,840.21 |
| Jun, 2014 | $11,700.73 | $1,997.84 | $2,003,842.36 |
| Jul, 2014 | $11,689.08 | $2,009.50 | $2,001,832.86 |
| Aug, 2014 | $11,677.36 | $2,021.22 | $1,999,811.64 |
| Sep, 2014 | $11,665.57 | $2,033.01 | $1,997,778.63 |
| Oct, 2014 | $11,653.71 | $2,044.87 | $1,995,733.76 |
| Nov, 2014 | $11,641.78 | $2,056.80 | $1,993,676.97 |
| Dec, 2014 | $11,629.78 | $2,068.80 | $1,991,608.17 |
| Jan, 2015 | $11,617.71 | $2,080.86 | $1,989,527.31 |
| Feb, 2015 | $11,605.58 | $2,093.00 | $1,987,434.30 |
| Mar, 2015 | $11,593.37 | $2,105.21 | $1,985,329.09 |
| Apr, 2015 | $11,581.09 | $2,117.49 | $1,983,211.60 |
| May, 2015 | $11,568.73 | $2,129.84 | $1,981,081.76 |
| Jun, 2015 | $11,556.31 | $2,142.27 | $1,978,939.49 |

RCC 000633

Attachment A

| | | | |
|---|---|---|---|
| Jul, 2015 | $11,543.81 | $2,154.76 | $1,976,784.72 |
| Aug, 2015 | $11,531.24 | $2,167.33 | $1,974,617.39 |
| Sep, 2015 | $11,518.60 | $2,179.98 | $1,972,437.41 |
| Oct, 2015 | $11,505.88 | $2,192.69 | $1,970,244.72 |
| Nov, 2015 | $11,493.09 | $2,205.48 | $1,968,039.23 |
| Dec, 2015 | $11,480.23 | $2,218.35 | $1,965,820.89 |
| Jan, 2016 | $11,467.29 | $2,231.29 | $1,963,589.60 |
| Feb, 2016 | $11,454.27 | $2,244.31 | $1,961,345.29 |
| Mar, 2016 | $11,441.18 | $2,257.40 | $1,959,087.89 |
| Apr, 2016 | $11,428.01 | $2,270.57 | $1,956,817.33 |
| May, 2016 | $11,414.77 | $2,283.81 | $1,954,533.52 |
| Jun, 2016 | $11,401.45 | $2,297.13 | $1,952,236.38 |
| Jul, 2016 | $11,388.05 | $2,310.53 | $1,949,925.85 |
| Aug, 2016 | $11,374.57 | $2,324.01 | $1,947,601.84 |
| Sep, 2016 | $11,361.01 | $2,337.57 | $1,945,264.27 |
| Oct, 2016 | $11,347.37 | $2,351.20 | $1,942,913.07 |
| Nov, 2016 | $11,333.66 | $2,364.92 | $1,940,548.15 |
| Dec, 2016 | $11,319.86 | $2,378.71 | $1,938,169.44 |
| Jan, 2017 | $11,305.99 | $2,392.59 | $1,935,776.85 |
| Feb, 2017 | $11,292.03 | $2,406.55 | $1,933,370.30 |
| Mar, 2017 | $11,277.99 | $2,420.58 | $1,930,949.71 |
| Apr, 2017 | $11,263.87 | $2,434.71 | $1,928,515.01 |
| May, 2017 | $11,249.67 | $2,448.91 | $1,926,066.10 |
| Jun, 2017 | $11,235.39 | $2,463.19 | $1,923,602.91 |
| Jul, 2017 | $11,221.02 | $2,477.56 | $1,921,125.35 |
| Aug, 2017 | $11,206.56 | $2,492.01 | $1,918,633.33 |
| Sep, 2017 | $11,192.03 | $2,506.55 | $1,916,126.78 |
| Oct, 2017 | $11,177.41 | $2,521.17 | $1,913,605.61 |
| Nov, 2017 | $11,162.70 | $2,535.88 | $1,911,069.73 |
| Dec, 2017 | $11,147.91 | $2,550.67 | $1,908,519.06 |
| Jan, 2018 | $11,133.03 | $2,565.55 | $1,905,953.51 |
| Feb, 2018 | $11,118.06 | $2,580.52 | $1,903,372.99 |
| Mar, 2018 | $11,103.01 | $2,595.57 | $1,900,777.42 |
| Apr, 2018 | $11,087.87 | $2,610.71 | $1,898,166.71 |
| May, 2018 | $11,072.64 | $2,625.94 | $1,895,540.77 |
| Jun, 2018 | $11,057.32 | $2,641.26 | $1,892,899.52 |
| Jul, 2018 | $11,041.91 | $2,656.66 | $1,890,242.85 |
| Aug, 2018 | $11,026.42 | $2,672.16 | $1,887,570.69 |
| Sep, 2018 | $11,010.83 | $2,687.75 | $1,884,882.94 |
| Oct, 2018 | $10,995.15 | $2,703.43 | $1,882,179.51 |
| Nov, 2018 | $10,979.38 | $2,719.20 | $1,879,460.32 |
| Dec, 2018 | $10,963.52 | $2,735.06 | $1,876,725.26 |
| Jan, 2019 | $10,947.56 | $2,751.01 | $1,873,974.24 |
| Feb, 2019 | $10,931.52 | $2,767.06 | $1,871,207.18 |
| Mar, 2019 | $10,915.38 | $2,783.20 | $1,868,423.98 |
| Apr, 2019 | $10,899.14 | $2,799.44 | $1,865,624.54 |
| May, 2019 | $10,882.81 | $2,815.77 | $1,862,808.77 |

RCC 000634

Attachment A

| | | |
|---|---|---|
| Jun, 2019 | $10,866.38 | $2,832.19 | $1,859,976.58 |
| Jul, 2019 | $10,849.86 | $2,848.72 | $1,857,127.86 |
| Aug, 2019 | $10,833.25 | $2,865.33 | $1,854,262.53 |
| Sep, 2019 | $10,816.53 | $2,882.05 | $1,851,380.48 |
| Oct, 2019 | $10,799.72 | $2,898.86 | $1,848,481.62 |
| Nov, 2019 | $10,782.81 | $2,915.77 | $1,845,565.85 |
| Dec, 2019 | $10,765.80 | $2,932.78 | $1,842,633.08 |
| Jan, 2020 | $10,748.69 | $2,949.89 | $1,839,683.19 |
| Feb, 2020 | $10,731.49 | $2,967.09 | $1,836,716.10 |
| Mar, 2020 | $10,714.18 | $2,984.40 | $1,833,731.70 |
| Apr, 2020 | $10,696.77 | $3,001.81 | $1,830,729.89 |
| May, 2020 | $10,679.26 | $3,019.32 | $1,827,710.56 |
| Jun, 2020 | $10,661.64 | $3,036.93 | $1,824,673.63 |
| Jul, 2020 | $10,643.93 | $3,054.65 | $1,821,618.98 |
| Aug, 2020 | $10,626.11 | $3,072.47 | $1,818,546.51 |
| Sep, 2020 | $10,608.19 | $3,090.39 | $1,815,456.12 |
| Oct, 2020 | $10,590.16 | $3,108.42 | $1,812,347.71 |
| Nov, 2020 | $10,572.03 | $3,126.55 | $1,809,221.16 |
| Dec, 2020 | $10,553.79 | $3,144.79 | $1,806,076.37 |
| Jan, 2021 | $10,535.45 | $3,163.13 | $1,802,913.24 |
| Feb, 2021 | $10,516.99 | $3,181.58 | $1,799,731.65 |
| Mar, 2021 | $10,498.43 | $3,200.14 | $1,796,531.51 |
| Apr, 2021 | $10,479.77 | $3,218.81 | $1,793,312.70 |
| May, 2021 | $10,460.99 | $3,237.59 | $1,790,075.11 |
| Jun, 2021 | $10,442.10 | $3,256.47 | $1,786,818.63 |
| Jul, 2021 | $10,423.11 | $3,275.47 | $1,783,543.17 |
| Aug, 2021 | $10,404.00 | $3,294.58 | $1,780,248.59 |
| Sep, 2021 | $10,384.78 | $3,313.79 | $1,776,934.79 |
| Oct, 2021 | $10,365.45 | $3,333.13 | $1,773,601.67 |
| Nov, 2021 | $10,346.01 | $3,352.57 | $1,770,249.10 |
| Dec, 2021 | $10,326.45 | $3,372.13 | $1,766,876.97 |
| Jan, 2022 | $10,306.78 | $3,391.80 | $1,763,485.18 |
| Feb, 2022 | $10,287.00 | $3,411.58 | $1,760,073.60 |
| Mar, 2022 | $10,267.10 | $3,431.48 | $1,756,642.11 |
| Apr, 2022 | $10,247.08 | $3,451.50 | $1,753,190.62 |
| May, 2022 | $10,226.95 | $3,471.63 | $1,749,718.98 |
| Jun, 2022 | $10,206.69 | $3,491.88 | $1,746,227.10 |
| Jul, 2022 | $10,186.32 | $3,512.25 | $1,742,714.84 |
| Aug, 2022 | $10,165.84 | $3,532.74 | $1,739,182.10 |
| Sep, 2022 | $10,145.23 | $3,553.35 | $1,735,628.75 |
| Oct, 2022 | $10,124.50 | $3,574.08 | $1,732,054.68 |
| Nov, 2022 | $10,103.65 | $3,594.93 | $1,728,459.75 |
| Dec, 2022 | $10,082.68 | $3,615.90 | $1,724,843.85 |
| Jan, 2023 | $10,061.59 | $3,636.99 | $1,721,206.86 |
| Feb, 2023 | $10,040.37 | $3,658.21 | $1,717,548.66 |
| Mar, 2023 | $10,019.03 | $3,679.54 | $1,713,869.11 |
| Apr, 2023 | $9,997.57 | $3,701.01 | $1,710,168.11 |

RCC 000635

Attachment A

| | | | |
|---|---|---|---|
| May, 2023 | $9,975.98 | $3,722.60 | $1,706,445.51 |
| Jun, 2023 | $9,954.27 | $3,744.31 | $1,702,701.19 |
| Jul, 2023 | $9,932.42 | $3,766.15 | $1,698,935.04 |
| Aug, 2023 | $9,910.45 | $3,788.12 | $1,695,146.92 |
| Sep, 2023 | $9,888.36 | $3,810.22 | $1,691,336.69 |
| Oct, 2023 | $9,866.13 | $3,832.45 | $1,687,504.25 |
| Nov, 2023 | $9,843.77 | $3,854.80 | $1,683,649.44 |
| Dec, 2023 | $9,821.29 | $3,877.29 | $1,679,772.15 |
| Jan, 2024 | $9,798.67 | $3,899.91 | $1,675,872.25 |
| Feb, 2024 | $9,775.92 | $3,922.66 | $1,671,949.59 |
| Mar, 2024 | $9,753.04 | $3,945.54 | $1,668,004.05 |
| Apr, 2024 | $9,730.02 | $3,968.55 | $1,664,035.50 |
| May, 2024 | $9,706.87 | $3,991.70 | $1,660,043.79 |
| Jun, 2024 | $9,683.59 | $4,014.99 | $1,656,028.80 |
| Jul, 2024 | $9,660.17 | $4,038.41 | $1,651,990.39 |
| Aug, 2024 | $9,636.61 | $4,061.97 | $1,647,928.42 |
| Sep, 2024 | $9,612.92 | $4,085.66 | $1,643,842.76 |
| Oct, 2024 | $9,589.08 | $4,109.50 | $1,639,733.26 |
| Nov, 2024 | $9,565.11 | $4,133.47 | $1,635,599.80 |
| Dec, 2024 | $9,541.00 | $4,157.58 | $1,631,442.22 |
| Jan, 2025 | $9,516.75 | $4,181.83 | $1,627,260.39 |
| Feb, 2025 | $9,492.35 | $4,206.23 | $1,623,054.16 |
| Mar, 2025 | $9,467.82 | $4,230.76 | $1,618,823.40 |
| Apr, 2025 | $9,443.14 | $4,255.44 | $1,614,567.95 |
| May, 2025 | $9,418.31 | $4,280.27 | $1,610,287.69 |
| Jun, 2025 | $9,393.34 | $4,305.23 | $1,605,982.46 |
| Jul, 2025 | $9,368.23 | $4,330.35 | $1,601,652.11 |
| Aug, 2025 | $9,342.97 | $4,355.61 | $1,597,296.50 |
| Sep, 2025 | $9,317.56 | $4,381.02 | $1,592,915.49 |
| Oct, 2025 | $9,292.01 | $4,406.57 | $1,588,508.91 |
| Nov, 2025 | $9,266.30 | $4,432.28 | $1,584,076.64 |
| Dec, 2025 | $9,240.45 | $4,458.13 | $1,579,618.51 |
| Jan, 2026 | $9,214.44 | $4,484.14 | $1,575,134.37 |
| Feb, 2026 | $9,188.28 | $4,510.29 | $1,570,624.07 |
| Mar, 2026 | $9,161.97 | $4,536.60 | $1,566,087.47 |
| Apr, 2026 | $9,135.51 | $4,563.07 | $1,561,524.40 |
| May, 2026 | $9,108.89 | $4,589.69 | $1,556,934.72 |
| Jun, 2026 | $9,082.12 | $4,616.46 | $1,552,318.26 |
| Jul, 2026 | $9,055.19 | $4,643.39 | $1,547,674.87 |
| Aug, 2026 | $9,028.10 | $4,670.47 | $1,543,004.39 |
| Sep, 2026 | $9,000.86 | $4,697.72 | $1,538,306.67 |
| Oct, 2026 | $8,973.46 | $4,725.12 | $1,533,581.55 |
| Nov, 2026 | $8,945.89 | $4,752.69 | $1,528,828.87 |
| Dec, 2026 | $8,918.17 | $4,780.41 | $1,524,048.46 |
| Jan, 2027 | $8,890.28 | $4,808.30 | $1,519,240.16 |
| Feb, 2027 | $8,862.23 | $4,836.34 | $1,514,403.82 |
| Mar, 2027 | $8,834.02 | $4,864.56 | $1,509,539.26 |

RCC 000636

Attachment A

| | | | |
|---|---|---|---|
| Apr, 2027 | $8,805.65 | $4,892.93 | $1,504,646.33 |
| May, 2027 | $8,777.10 | $4,921.47 | $1,499,724.85 |
| Jun, 2027 | $8,748.39 | $4,950.18 | $1,494,774.67 |
| Jul, 2027 | $8,719.52 | $4,979.06 | $1,489,795.61 |
| Aug, 2027 | $8,690.47 | $5,008.10 | $1,484,787.50 |
| Sep, 2027 | $8,661.26 | $5,037.32 | $1,479,750.19 |
| Oct, 2027 | $8,631.88 | $5,066.70 | $1,474,683.48 |
| Nov, 2027 | $8,602.32 | $5,096.26 | $1,469,587.23 |
| Dec, 2027 | $8,572.59 | $5,125.99 | $1,464,461.24 |
| Jan, 2028 | $8,542.69 | $5,155.89 | $1,459,305.35 |
| Feb, 2028 | $8,512.61 | $5,185.96 | $1,454,119.39 |
| Mar, 2028 | $8,482.36 | $5,216.22 | $1,448,903.17 |
| Apr, 2028 | $8,451.94 | $5,246.64 | $1,443,656.53 |
| May, 2028 | $8,421.33 | $5,277.25 | $1,438,379.28 |
| Jun, 2028 | $8,390.55 | $5,308.03 | $1,433,071.25 |
| Jul, 2028 | $8,359.58 | $5,339.00 | $1,427,732.25 |
| Aug, 2028 | $8,328.44 | $5,370.14 | $1,422,362.11 |
| Sep, 2028 | $8,297.11 | $5,401.47 | $1,416,960.65 |
| Oct, 2028 | $8,265.60 | $5,432.97 | $1,411,527.67 |
| Nov, 2028 | $8,233.91 | $5,464.67 | $1,406,063.01 |
| Dec, 2028 | $8,202.03 | $5,496.54 | $1,400,566.46 |
| Jan, 2029 | $8,169.97 | $5,528.61 | $1,395,037.85 |
| Feb, 2029 | $8,137.72 | $5,560.86 | $1,389,477.00 |
| Mar, 2029 | $8,105.28 | $5,593.30 | $1,383,883.70 |
| Apr, 2029 | $8,072.65 | $5,625.92 | $1,378,257.78 |
| May, 2029 | $8,039.84 | $5,658.74 | $1,372,599.04 |
| Jun, 2029 | $8,006.83 | $5,691.75 | $1,366,907.28 |
| Jul, 2029 | $7,973.63 | $5,724.95 | $1,361,182.33 |
| Aug, 2029 | $7,940.23 | $5,758.35 | $1,355,423.98 |
| Sep, 2029 | $7,906.64 | $5,791.94 | $1,349,632.05 |
| Oct, 2029 | $7,872.85 | $5,825.72 | $1,343,806.32 |
| Nov, 2029 | $7,838.87 | $5,859.71 | $1,337,946.61 |
| Dec, 2029 | $7,804.69 | $5,893.89 | $1,332,052.72 |
| Jan, 2030 | $7,770.31 | $5,928.27 | $1,326,124.45 |
| Feb, 2030 | $7,735.73 | $5,962.85 | $1,320,161.60 |
| Mar, 2030 | $7,700.94 | $5,997.64 | $1,314,163.96 |
| Apr, 2030 | $7,665.96 | $6,032.62 | $1,308,131.34 |
| May, 2030 | $7,630.77 | $6,067.81 | $1,302,063.53 |
| Jun, 2030 | $7,595.37 | $6,103.21 | $1,295,960.32 |
| Jul, 2030 | $7,559.77 | $6,138.81 | $1,289,821.51 |
| Aug, 2030 | $7,523.96 | $6,174.62 | $1,283,646.89 |
| Sep, 2030 | $7,487.94 | $6,210.64 | $1,277,436.25 |
| Oct, 2030 | $7,451.71 | $6,246.87 | $1,271,189.39 |
| Nov, 2030 | $7,415.27 | $6,283.31 | $1,264,906.08 |
| Dec, 2030 | $7,378.62 | $6,319.96 | $1,258,586.12 |
| Jan, 2031 | $7,341.75 | $6,356.83 | $1,252,229.29 |
| Feb, 2031 | $7,304.67 | $6,393.91 | $1,245,835.39 |

RCC 000637

Attachment A

| | | | |
|---|---|---|---|
| Mar, 2031 | $7,267.37 | $6,431.21 | $1,239,404.18 |
| Apr, 2031 | $7,229.86 | $6,468.72 | $1,232,935.46 |
| May, 2031 | $7,192.12 | $6,506.45 | $1,226,429.01 |
| Jun, 2031 | $7,154.17 | $6,544.41 | $1,219,884.60 |
| Jul, 2031 | $7,115.99 | $6,582.58 | $1,213,302.01 |
| Aug, 2031 | $7,077.60 | $6,620.98 | $1,206,681.03 |
| Sep, 2031 | $7,038.97 | $6,659.61 | $1,200,021.42 |
| Oct, 2031 | $7,000.12 | $6,698.45 | $1,193,322.97 |
| Nov, 2031 | $6,961.05 | $6,737.53 | $1,186,585.44 |
| Dec, 2031 | $6,921.75 | $6,776.83 | $1,179,808.61 |
| Jan, 2032 | $6,882.22 | $6,816.36 | $1,172,992.25 |
| Feb, 2032 | $6,842.45 | $6,856.12 | $1,166,136.13 |
| Mar, 2032 | $6,802.46 | $6,896.12 | $1,159,240.01 |
| Apr, 2032 | $6,762.23 | $6,936.34 | $1,152,303.66 |
| May, 2032 | $6,721.77 | $6,976.81 | $1,145,326.86 |
| Jun, 2032 | $6,681.07 | $7,017.51 | $1,138,309.35 |
| Jul, 2032 | $6,640.14 | $7,058.44 | $1,131,250.91 |
| Aug, 2032 | $6,598.96 | $7,099.61 | $1,124,151.30 |
| Sep, 2032 | $6,557.55 | $7,141.03 | $1,117,010.27 |
| Oct, 2032 | $6,515.89 | $7,182.69 | $1,109,827.58 |
| Nov, 2032 | $6,473.99 | $7,224.58 | $1,102,603.00 |
| Dec, 2032 | $6,431.85 | $7,266.73 | $1,095,336.27 |
| Jan, 2033 | $6,389.46 | $7,309.12 | $1,088,027.15 |
| Feb, 2033 | $6,346.83 | $7,351.75 | $1,080,675.40 |
| Mar, 2033 | $6,303.94 | $7,394.64 | $1,073,280.76 |
| Apr, 2033 | $6,260.80 | $7,437.77 | $1,065,842.99 |
| May, 2033 | $6,217.42 | $7,481.16 | $1,058,361.83 |
| Jun, 2033 | $6,173.78 | $7,524.80 | $1,050,837.03 |
| Jul, 2033 | $6,129.88 | $7,568.70 | $1,043,268.33 |
| Aug, 2033 | $6,085.73 | $7,612.85 | $1,035,655.48 |
| Sep, 2033 | $6,041.32 | $7,657.25 | $1,027,998.23 |
| Oct, 2033 | $5,996.66 | $7,701.92 | $1,020,296.31 |
| Nov, 2033 | $5,951.73 | $7,746.85 | $1,012,549.46 |
| Dec, 2033 | $5,906.54 | $7,792.04 | $1,004,757.42 |
| Jan, 2034 | $5,861.08 | $7,837.49 | $996,919.92 |
| Feb, 2034 | $5,815.37 | $7,883.21 | $989,036.71 |
| Mar, 2034 | $5,769.38 | $7,929.20 | $981,107.52 |
| Apr, 2034 | $5,723.13 | $7,975.45 | $973,132.06 |
| May, 2034 | $5,676.60 | $8,021.97 | $965,110.09 |
| Jun, 2034 | $5,629.81 | $8,068.77 | $957,041.32 |
| Jul, 2034 | $5,582.74 | $8,115.84 | $948,925.48 |
| Aug, 2034 | $5,535.40 | $8,163.18 | $940,762.30 |
| Sep, 2034 | $5,487.78 | $8,210.80 | $932,551.50 |
| Oct, 2034 | $5,439.88 | $8,258.69 | $924,292.81 |
| Nov, 2034 | $5,391.71 | $8,306.87 | $915,985.94 |
| Dec, 2034 | $5,343.25 | $8,355.33 | $907,630.61 |
| Jan, 2035 | $5,294.51 | $8,404.07 | $899,226.55 |

RCC 000638

Attachment A

| | | | |
|---|---|---|---|
| Feb, 2035 | $5,245.49 | $8,453.09 | $890,773.46 |
| Mar, 2035 | $5,196.18 | $8,502.40 | $882,271.06 |
| Apr, 2035 | $5,146.58 | $8,552.00 | $873,719.06 |
| May, 2035 | $5,096.69 | $8,601.88 | $865,117.17 |
| Jun, 2035 | $5,046.52 | $8,652.06 | $856,465.11 |
| Jul, 2035 | $4,996.05 | $8,702.53 | $847,762.58 |
| Aug, 2035 | $4,945.28 | $8,753.30 | $839,009.28 |
| Sep, 2035 | $4,894.22 | $8,804.36 | $830,204.93 |
| Oct, 2035 | $4,842.86 | $8,855.72 | $821,349.21 |
| Nov, 2035 | $4,791.20 | $8,907.37 | $812,441.84 |
| Dec, 2035 | $4,739.24 | $8,959.33 | $803,482.50 |
| Jan, 2036 | $4,686.98 | $9,011.60 | $794,470.90 |
| Feb, 2036 | $4,634.41 | $9,064.16 | $785,406.74 |
| Mar, 2036 | $4,581.54 | $9,117.04 | $776,289.70 |
| Apr, 2036 | $4,528.36 | $9,170.22 | $767,119.48 |
| May, 2036 | $4,474.86 | $9,223.71 | $757,895.76 |
| Jun, 2036 | $4,421.06 | $9,277.52 | $748,618.24 |
| Jul, 2036 | $4,366.94 | $9,331.64 | $739,286.61 |
| Aug, 2036 | $4,312.51 | $9,386.07 | $729,900.53 |
| Sep, 2036 | $4,257.75 | $9,440.83 | $720,459.71 |
| Oct, 2036 | $4,202.68 | $9,495.90 | $710,963.81 |
| Nov, 2036 | $4,147.29 | $9,551.29 | $701,412.52 |
| Dec, 2036 | $4,091.57 | $9,607.01 | $691,805.52 |
| Jan, 2037 | $4,035.53 | $9,663.05 | $682,142.47 |
| Feb, 2037 | $3,979.16 | $9,719.41 | $672,423.06 |
| Mar, 2037 | $3,922.47 | $9,776.11 | $662,646.95 |
| Apr, 2037 | $3,865.44 | $9,833.14 | $652,813.81 |
| May, 2037 | $3,808.08 | $9,890.50 | $642,923.31 |
| Jun, 2037 | $3,750.39 | $9,948.19 | $632,975.12 |
| Jul, 2037 | $3,692.35 | $10,006.22 | $622,968.89 |
| Aug, 2037 | $3,633.99 | $10,064.59 | $612,904.30 |
| Sep, 2037 | $3,575.28 | $10,123.30 | $602,781.00 |
| Oct, 2037 | $3,516.22 | $10,182.36 | $592,598.64 |
| Nov, 2037 | $3,456.83 | $10,241.75 | $582,356.89 |
| Dec, 2037 | $3,397.08 | $10,301.50 | $572,055.39 |
| Jan, 2038 | $3,336.99 | $10,361.59 | $561,693.80 |
| Feb, 2038 | $3,276.55 | $10,422.03 | $551,271.77 |
| Mar, 2038 | $3,215.75 | $10,482.83 | $540,788.95 |
| Apr, 2038 | $3,154.60 | $10,543.98 | $530,244.97 |
| May, 2038 | $3,093.10 | $10,605.48 | $519,639.49 |
| Jun, 2038 | $3,031.23 | $10,667.35 | $508,972.14 |
| Jul, 2038 | $2,969.00 | $10,729.57 | $498,242.56 |
| Aug, 2038 | $2,906.41 | $10,792.16 | $487,450.40 |
| Sep, 2038 | $2,843.46 | $10,855.12 | $476,595.28 |
| Oct, 2038 | $2,780.14 | $10,918.44 | $465,676.84 |
| Nov, 2038 | $2,716.45 | $10,982.13 | $454,694.71 |
| Dec, 2038 | $2,652.39 | $11,046.19 | $443,648.52 |

RCC 000639

Attachment A

| Jan, 2039 | $2,587.95 | $11,110.63 | $432,537.89 |
| Feb, 2039 | $2,523.14 | $11,175.44 | $421,362.45 |
| Mar, 2039 | $2,457.95 | $11,240.63 | $410,121.82 |
| Apr, 2039 | $2,392.38 | $11,306.20 | $398,815.62 |
| May, 2039 | $2,326.42 | $11,372.15 | $387,443.47 |
| Jun, 2039 | $2,260.09 | $11,438.49 | $376,004.98 |
| Jul, 2039 | $2,193.36 | $11,505.22 | $364,499.76 |
| Aug, 2039 | $2,126.25 | $11,572.33 | $352,927.43 |
| Sep, 2039 | $2,058.74 | $11,639.84 | $341,287.59 |
| Oct, 2039 | $1,990.84 | $11,707.73 | $329,579.86 |
| Nov, 2039 | $1,922.55 | $11,776.03 | $317,803.83 |
| Dec, 2039 | $1,853.86 | $11,844.72 | $305,959.11 |
| Jan, 2040 | $1,784.76 | $11,913.82 | $294,045.29 |
| Feb, 2040 | $1,715.26 | $11,983.31 | $282,061.98 |
| Mar, 2040 | $1,645.36 | $12,053.22 | $270,008.76 |
| Apr, 2040 | $1,575.05 | $12,123.53 | $257,885.23 |
| May, 2040 | $1,504.33 | $12,194.25 | $245,690.99 |
| Jun, 2040 | $1,433.20 | $12,265.38 | $233,425.60 |
| Jul, 2040 | $1,361.65 | $12,336.93 | $221,088.68 |
| Aug, 2040 | $1,289.68 | $12,408.89 | $208,679.78 |
| Sep, 2040 | $1,217.30 | $12,481.28 | $196,198.50 |
| Oct, 2040 | $1,144.49 | $12,554.09 | $183,644.41 |
| Nov, 2040 | $1,071.26 | $12,627.32 | $171,017.09 |
| Dec, 2040 | $997.60 | $12,700.98 | $158,316.12 |
| Jan, 2041 | $923.51 | $12,775.07 | $145,541.05 |
| Feb, 2041 | $848.99 | $12,849.59 | $132,691.46 |
| Mar, 2041 | $774.03 | $12,924.54 | $119,766.91 |
| Apr, 2041 | $698.64 | $12,999.94 | $106,766.98 |
| May, 2041 | $622.81 | $13,075.77 | $93,691.21 |
| Jun, 2041 | $546.53 | $13,152.05 | $80,539.16 |
| Jul, 2041 | $469.81 | $13,228.77 | $67,310.39 |
| Aug, 2041 | $392.64 | $13,305.93 | $54,004.46 |
| Sep, 2041 | $315.03 | $13,383.55 | $40,620.91 |
| Oct, 2041 | $236.96 | $13,461.62 | $27,159.28 |
| Nov, 2041 | $158.43 | $13,540.15 | $13,619.13 |
| Dec, 2041 | $79.44 | $13,619.13 | $0.00 |

RCC 000640